IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

CLACKAMAS COUNTY ASSESSOR, )
)
          Plaintiff, )  TC-MD 130128C
)
     v. )
)
KAREN M. DREBES, TRUSTEE, )
LAWRENCE T. DREBES, TRUSTEE, )
)
          Defendants. )  **FINAL DECISION**

The court entered its Decision in the above-entitled matter on November 14, 2013. The court did not receive a request for an award of costs and disbursements (TCR-MD 19) within 14 days after its Decision was entered. The court's Final Decision incorporates its Decision without change.

Plaintiff Clackamas County Assessor appeals from an order of the Clackamas County Board of Property Tax Appeals (Board) that reduced the real market value (RMV) of Defendants' mountain resort condominium, identified as Account 05021691, for the 2012-13 tax year. Trial in the matter was held by telephone August 12, 2013. Plaintiff was represented by Richard Valasek (Valasek), Appraiser II, Clackamas County Assessor's office. Defendants were represented by Karen Drebes (Drebes).

## I. STATEMENT OF FACTS

The subject property is a 2,355 square foot single level condominium unit on the third floor of a four story building at the Collins Lake Resort at Government Camp near Mount Hood, a popular ski mountain and recreational destination in Oregon. (Ptf's Ex 1 at 3.) There are 32 units in the building, eight on each floor. (*Id*. at 4-5.) The building was built in 2007. (*Id*. at 4.)

/ / /

Each floor has two end units and six interior units. (*Id.* at 5.) The subject property, unit 17, is an end unit. (Ptf's Ex 2 at 1.)

All end units on the first three floors – including the subject – are approximately 400 square feet larger than the interior units (which are approximately 1,860 square feet in size); the extra space is attributable to a larger master bedroom. (Ptf's Ex 1 at 5.) Plaintiff's appraiser Valasek testified that end units on the first two floors (the subject is a third floor unit) are superior in configuration to those on the third floor, because the master bedrooms on the first two floors have fireplaces and Jacuzzi spa tubs which the master bedrooms on the third floor do not. Additionally, photographs submitted by Defendants support the testimony of Drebes that the two end unit master bedrooms on the third floor (one of which is the subject) have sloped ceilings with considerably less headroom and a much shorter wall that limits the effective size of those bedrooms, and their functional utility. (Def's Exs A-D.)

Defendants purchased the subject property – unit #17 – in March 2008 for $856,580. (Ptf's Ex 2 at 1; Defs' Ex K.) Defendants purchased the adjoining "interior" unit #18 three months later[1] for $752,000. (Ptf's Ex 2 at 1; *See* Defs' Ex L.) When Valasek questioned Drebes why Defendants paid $100,000 more for the subject end unit than the adjoining interior unit they bought three months later, Drebes testified that they first bought the subject unit, but did not like the front bedroom so they bought the adjoining units (#18) three months later and put a door between the two units, giving them a nicer master bedroom in the interior unit. She testified candidly that they were "price insensitive," and that they own a total of eight properties. The reason they bought the units when they did was to avoid hauling their equipment and personal belongings up and down the mountain each time they traveled there for recreation.

---

[1] Defendants' Exhibit L, a Fidelity Nation Title property summary, indicates a transfer date of March 18, 2008, for unit #18, rather than a June 2008 transfer otherwise evidenced and testified to.

The subject property has two bedrooms and two bathrooms and has high-quality interior amenities. (Ptf's Ex 1 at 3-4.) Those amenities include "cherry hardwood flooring, a stone faced fireplace, alder cabinets, [] granite countertops, stainless steel appliances, [] tile floors [in the bathrooms], tile and glass shower surrounds and cast iron tubs." (*Id*. at 3.)

There is a common parking garage with 45 parking spaces below the first level of living space in the building. (Ptf's Ex 1 at 3, 5.) "Common elements include an outdoor swimming pool and spa, recreation room, open areas and 2 building elevators." (*Id*. at 3.)

Plaintiff set the RMV on the assessment and tax rolls for the 2012-13 tax year at $390,290. (Ptf's Compl at 2.) Defendants appealed that value to the Board and the Board reduced the RMV to $350,000. (*Id*.) The maximum assessed value (MAV) is $520,637. (*Id*.) The Board RMV reduction lowered the assessed value (AV) from $390,290 to $350,000.[2]

By its Complaint, Plaintiff has requested that the RMV be $390,290, the figure Plaintiff placed on the rolls prior to the Board reduction. Defendants filed an Answer requesting that the RMV remain at $350,000. (Defs' Ans at 1.)

Plaintiff submitted an appraisal report with six comparable sales of resort condominium units in the same complex as the subject property. (Ptf's Ex 1 at 4.) All of the comparable sales involve units on the second and third floors. (*Id.* at 5.) Five of Plaintiff's comparable sales sold in September 2011 and the sixth (#1) approximately one month later on October 24, 2011. (*Id.* at 4.) The assessment date for the tax year at issue (2012-13) was January 1, 2012. *See generally*

---

[2] Oregon law provides for a MAV that was originally (1997) a percentage of the 1995 RMV on the assessment and tax rolls. Or Const, Art XI, § 11(1)(a). That constitutional amendment is codified in ORS 308.146. Subsection (1) of ORS 308.146 limits the annual increase in MAV to three percent. For property after 1995, such as the subject condominium unit, MAV is easily established as a percentage of MAV to RMV. ORS 308.153. It is limited thereafter to the three percent cap in ORS 308.146(1). RMV is basically the market value of the property, which is the amount the property would typically sell for on the open market between knowledgeable and disinterested parties in the arm's-length transaction. ORS 308.205. Finally, assessed value (AV) is the lesser of RMV or MAV. ORS 308.146(2).

ORS 308.007.[3] Three of the six comparable sales are second-floor units and the remaining three are on the third floor. (Ptf's Ex 2 at 1.) The subject is an end unit on the third floor and only one of Plaintiff's comparable sales (#4) is an end unit, but it is on the second floor. (Ptf's Exs 1 at 4, 2 at 1.) As is discussed more fully below, Plaintiff's appraiser and only trial witness, Valasek, testified that there is an 85 percent difference in the sale prices of units on the first and second floor compared to those on the third floor, with the units on the first two floors selling for more than those on the third floor. There *are*, however, differences in the sale prices of the units on the first, second, and third floors, but not as presented by Valasek. Additionally, there are differences in the sale prices of interior units and end units. That too is discussed in more detail in the court's analysis below. Also, Valasek testified that all of his comparables were sold by the developer at auction, and his report includes that fact. (Ptf's Ex 1 at 5.) Valasek notes in his report that his "comparables * * * are felt to be the best indicators of market value and the most appropriate based upon the effective date of appraisal." (*Id*.) Valasek testified that, in his opinion, the auction sales were not "typical" auction sales because some were purchased for cash (no financing) while others were financed, and he notes in his appraisal report that "[t]he auction was advertised and well publicized in advance of the sale." (*Id*.)

Valasek's unadjusted sale prices are as follows: three units (#1, #2, and #6) sold for $329,600; two units (#3 and #5) sold for $349,000, and one unit (#4) sold for $465,560. (*Id*. at 4.) The three units selling for $329,600 are third floor units. (Ptf's Exs 1 at 4, 2 at 1.) All three are interior units. (*Id*.) The two units that sold for $349,000 are both second-floor interior units and both transactions occurred on the same date (September 16, 2011). (*Id*.) The outlier in terms of sale price is Plaintiff's comparable number four, which sold September 27, 2011, for

---

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2011.

$465,560. That sale is an end unit (#16), as is the subject, only one floor below and on the other end of the building. (*See* Ptf's Ex 2 at 1.)

Plaintiff adjusted its comparable sales for time, location (which in this case was meant to distinguish between interior and end units), and parking space. (Ptf's Ex 1 at 4.) Plaintiff then established a range of value, as adjusted, ranging from a low of $372,460 for comparable #4, which is Plaintiff's only sale of an end unit, and a high of $382,200 (comparable #1). Based on those adjusted sale prices, Valasek, Plaintiff's appraiser, estimated the value of the subject property to be $380,000 as of January 1, 2012. (Ptf's Ex 1 at 14.) Plaintiff made a significant negative adjustment of $70,000 to its comparable #4 (its only end unit sale) because that unit had a master bedroom superior to the subject. (*See* Ptf's Ex 1 at 4.) Noting that the master bedrooms on both the first and second floors of the building in which Defendants' unit is located enjoy the added amenities of a fireplace and Jacuzzi spa tub, whereas the configuration of the master bedrooms on the third floor precluded the inclusion of those features, Plaintiff then determined that subtracting $70,000 from the sale of its comparable #4 "result[ed] in an adjusted sale price of $395,000 [for comparable sale #4]." (*Id*. at 5-6.) Plaintiff used that analysis to arrive at an opinion in that the interior units warranted a $75,000 positive adjustment.

Defendants presented a collection of photographs depicting the extreme difference between the subject third-floor end unit and the adjoining interior unit, as well as the inferiority of the subject to units below, plus three sales of interior units, all of which appear in Plaintiff's appraisal report and sold for $329,600. Drebes, who is not an appraiser, opined that her end unit was actually more comparable to an interior unit and, applying several adjustments taken from Plaintiff's appraisal, to arrive at an estimated value of $354,600, a figure only $4,600 above the $350,000 RMV on the rolls as reduced by the Board. Drebes then pointed out several concerns

she had with Plaintiff's appraisal, and testified that, in her opinion, her approach was more reliable.

## II. ANALYSIS

In Oregon, all real property "not exempt from ad valorem property taxation or subject to special assessment shall be valued at 100 percent of its real market value." ORS 308.232.

RMV is defined in ORS 308.205(1) as follows:

"Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

RMV is determined by the particular methods and procedures adopted by the Department of Revenue. ORS 308.205(2). There are three approaches to valuation (income, cost, and sales comparison) that must be considered when determining the RMV of a property, although they need not all be developed. OAR 150-308.205-(A)(2)(a) (stating that all three approaches must be considered, although all three approaches may not be applicable to the valuation of a given property); *see also Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003); *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995). When value is appealed to the court, the approach to be used (or combination of approaches) is a question of fact to be determined by the court upon the record. *Pacific Power & Light Co. v. Dept. of Revenue*, 286 Or 529, 533, 596 P2d 912 (1979) ("[W]hether in any given assessment one [valuation] approach should be used exclusive of the others or is preferable to another or to a combination of approaches is a question of fact to be determined by the court upon the record.").

As the party seeking affirmative relief, Plaintiff bears the burden of proving that the subject property's RMV on the tax roll is incorrect. *See* ORS 305.427. Plaintiff must establish its claim "by a preponderance of the evidence, or the more convincing or greater weight of

evidence." *Schaefer v. Dept. of Rev.*, TC No 4530, WL 914208 at *2 (July 12, 2001) (citing *Feves v. Dept. of Revenue*, 4 OTR 302 (1971)).

Burden of proof requires that the party seeking relief (Plaintiff in this case) provide evidence to support its argument. The evidence that a plaintiff provides must be *competent* evidence of the requested RMV of the property in order to sustain the burden of proof. *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (citing *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (emphasis added).

"Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD No 110300D, WL 879285 (Mar 13, 2012). The adjustments must also be tied to the market and stand up under scrutiny. Evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990).

This court has previously noted that value is a range rather than an absolute. *Price v. Dept. of Rev.*, 7 OTR 18, 25 (1977). "The value of property is ultimately a question of fact." *Chart Development Corp. v. Dept. of Rev.,* 16 OTR 9, 11 (2001) (citation omitted). Finally, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

The court has a number of concerns with Plaintiff's appraisal. Among them are the following. First, while Valasek testified that there was an 85 percent difference between the sale prices of units on the first and second floors compared to those on the third floor, that figure is confusing and misleading. Admittedly the prices paid for units in March 2008 were generally

greater the higher up they were located (first floor, second floor, third floor), the March 2008 sales of the three *end* units on the first, second, and third floors tell a different story. The subject property and the two other end units on the same end of the building and directly below the subject sold for $891,241 (first floor unit), $926,496 (second floor unit), and $856,580 (the subject third floor unit). (Ptf's Ex 2 at 1.) Thus, while it is true that the buyer of the end unit on the second floor paid approximately $35,000 more for that unit than did the buyer of the first floor end unit, Defendants bought their third floor end unit (the subject property) for less than either of the other two end unit buyers in their building, and, again, all sales occurred in March 2008. The highest price paid in 2008 was for the end unit on the second floor ($926,496), followed by the unit on the first floor (which sold for $891,241). Notably, Defendants paid $34,661, or approximately 3.9 percent less for their third-floor unit than did the buyer of the end unit two floors below, and $69,916, or 8.162 percent less than the buyer of end unit directly below them on the second floor.

A more perplexing aspect of Plaintiff's value estimate is the $70,000 adjustment Valasek made to his 2011 sales comparables. (See Ptf's Ex 1 at 6.) The court spent considerable time and effort trying to comprehend Valasek's 85 percent ratio he testified about at trial, and which appears in Plaintiff's Exhibit 1 at pages 5 and 6, but was unable to understand the analysis or thought process behind it. In fact, the court could not ascertain how Valasek utilized sale price differences between interior and end units on the first two floors with the difference in sale prices between the end and interior third-floor units (which are the subject property end unit and Defendant's adjoining interior unit) to arrive at his $1 million value estimate for the subject, which Valasek presumes is "the market's reaction to the subject unit's lesser desirability." (Ptf's Ex. 1 at 5.) The court understands that Valasek compared his $1 million assumed price estimate

for the subject with the actual sale price of the subject to derive his 85 percent ratio, but the court could not replicate the mathematics to calculate a $1 million "price." Thus, the court rejects the application of that ratio to the second floor end unit sale. (*See id*. at 6.) Not only was the court unable to replicate the $1 million assumed sale price estimate for the subject, but all of the sales used in that analysis were from 2008 and Plaintiff failed to establish that market reactions in 2008 were comparable to those in 2011, which is the sales data pool that Valasek used to estimate the subject's value as of January 1, 2012. Additionally, the second floor end unit is on the opposite end of the building, one floor below the subject, and Valasek applied his 85 percent ratio to that comparable sale to establish the negative $70,000 adjustment he applied to his comparable sales.

Moreover, all of Plaintiff's comparable sales are either second or third floor units, which brings into question the relevance of some of Plaintiff's sales data on interior units as applied to the subject end unit.

Second, Plaintiff chose to confine its value estimate appearing in Valasek's appraisal report to units within the same building as the subject, which limited the data pool. The court understands why an appraiser might make such a choice given that there were six sales in that building within the four month window immediately preceding the applicable assessment date of January 1, 2012. However, as Plaintiff notes in its report and acknowledged by Valasek in his trial testimony, all of the comparable sales are auction sales. This court has, on numerous occasions, noted the concern inherent in relying on the sale of property sold at auction. The court has been reluctant to consider foreclosure sales as "arm's-length transactions" because such sales "may well involve an element of compulsion on the part of the seller." *Kryl v. Lane County Assessor*, TC-MD No 100192B, WL 1197444 *2 (Mar 30, 2011); *see also Knight Bridge*

*Crossing, LLC v. Washington County Assessor*, TC-MD No 110238N, WL 176682 *4 (Jan 23, 2012); *Monserud v. Clatsop County Assessor*, TC-MD No 100577C, WL 2222187 (Jun 6, 2011); *Yarbrough v. Marion County Assessor*, TC-MD No 070229C, WL 4440216 at *4 (Dec 12, 2007). And, whereas all of Plaintiff's comparables are auction sales, Defendants did not purchase their unit at auction in March 2008.

This court has previously commented on the problem with auction sales. "An auction is defined as a 'sale of property to the highest bidder.' An auction eliminates the negotiation between the buyer and seller and requires buyers to negotiate with each other, generally leaving the seller out of the negotiation process." *Hammond v. Deschutes County Assessor* (Hammond), TC-MD No 120290N, WL 6678849 *4 (Dec 24, 2012), quoting *Schnabel v. Clatsop County Assessor*, TC-MD No 100618D , WL 646678 at *2 (Feb 22, 2011) (citing *Webster's Third Int'l Dictionary* 142 (unabridged ed 2002)). Thus, as the court noted in *Hammond*, "[a]n auction sale is not an "arm's-length transaction" under ORS 308.205 and is not necessarily reliable evidence of real market value." WL 6678849 at *7 (Dec 24, 2012).

Third, the court is not persuaded by the approach Plaintiff used to arrive at its $75,000 positive adjustment to the interior units. That adjustment was based on an analysis of a limited number of sales on the first two floors, a comparison of the sale price of the subject unit versus the immediately adjoining interior unit, also purchased by Defendants, resulting in a "ratio" of 85 percent, which Plaintiff somehow used to establish the $75,000 positive adjustment it made to three of the five interior units (the other two being adjusted $55,000). (Ptf's Ex 1 at 4-6.)

The court's fourth concern the court has with Plaintiff's appraisal is that all of the comparable sales of its interior units on the third floor sold for less at auction and did the interior units Plaintiff included from the sales on the second floor, whereas the original sales in 2008, limited as they are, show that the interior units sold for ever increasing prices moving from the

first to the third floor, with the sale of unit 2 (the first floor unit) being $653,535 and of the sale of unit 18 (the third floor unit), being $752,000. If nothing else, that the anomaly calls into question the reliability of Plaintiff's 2011 auction sales used in its appraisal.

The court's fifth concern is of lesser severity, and perhaps more of an observation than a concern. Having said that, the court observes that the difference between the current RMV on the rolls, as reduced by the Board, and the value requested by Plaintiff, is approximately 10 percent. In *Corvallis Country Club v. Dept. of Rev.*, 10 OTR 306, 307 (1996) (quoting *Price v. Dept. of Rev.*, 7 OTR 18, 25 (1977)), the court stated: "[although not a rule of law, it is generally accepted that appraisers will be deemed equally competent and their testimony useful if, acting independently, they come within 10 percent of each other in the ordinary case."

### III. CONCLUSION

Based on the foregoing analysis, the court concludes that Plaintiff has failed to establish its case by a preponderance of the evidence. Accordingly, the court will not disturb the Board's determination that the RMV of the subject property, as of January 1, 2012, was $350,000. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this \_\_\_ day of December 2013.

DAN ROBINSON
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by* <u>mailing</u> *to: 1163 State Street, Salem, OR 97301-2563; or by* <u>hand delivery</u> *to: Fourth Floor, 1241 State Street, Salem, OR.*

/ / /

*Your Complaint must be submitted within __60__ days after the date of the Final Decision or this Final Decision cannot be changed.*

*This document was signed by Magistrate Dan Robinson on December 3, 2013. The Court filed and entered this document on December 3, 2013.*